FILED
SUPERIOR COURT
OF GUAM

2020 OCT 27 PM 4: 25

CLERK OF COURT
BY: _____

**IN THE SUPERIOR COURT OF GUAM**

| | |
|---|---|
| CHAD IKEI, ET AL.,<br><br>                    Petitioners,<br><br>         vs.<br><br>DEPARTMENT OF PUBLIC HEALTH AND<br>SOCIAL SERVICES,<br><br>                    Respondent. | **Superior Court Case No. SP0138-20**<br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |
| IN RE: TREVIN JONES, ET AL.,<br><br>                    Respondents. | **Superior Court Case No. SP0141-20** |

In these Findings of Fact and Conclusions of Law, the Court determines that Respondent Department of Public Health and Social Services (DPHSS) has shown that its quarantine procedures which initially place arriving passengers in a government facility, with a transfer to home quarantine upon the receipt of a negative test on or about the sixth day, is reasonably necessary to prevent or limit the importation and transmission of COVID-19 to others in Guam. However, beyond that initial term, DPHSS has less restrictive means of quarantine at its disposal. Asymptomatic persons who refuse to test have a less restrictive alternative, that is, a home assessment and a transfer to home quarantine by or before the tenth day when they are substantially less likely to spread an infection. For persons who are symptomatic and refuse to take a test, however, there is no less restrictive alternative to a fourteen-day quarantine at a government facility.

ORIGINAL

The Court also rules on various allegations raised by Petitioners Chad Ikei, Chance Ikei, Rosalani Ikei, Tiare-Lynn Ikei, and the two minor Ikei children. The Court determines that DPHSS failed to comply with 10 GCA § 19605 in not issuing a directive to Ikeis, but that it did properly address their hardship application. The Court also includes a written memorialization of its ruling issued from the bench that the Ikeis should be released from home quarantine on their seventeenth day of quarantine, based on the facts provided as to the family's prior COVID-19 infection and Rosalani's release from isolation.

## I.  PROCEDURAL BACKGROUND

On September 22, 2020, on their sixth day in a government quarantine facility, the Ikeis filed an Order to Show Cause for a hearing on their Verified Petition for Habeas Corpus, Alternative Writ of Mandamus, and Injunctive Relief. *Ikei v. DPHSS*, SP0138-20 (Order to Show Cause (Sep. 22, 2020)). The next day, DPHSS filed a petition under 10 GCA § 19605 seeking the continued quarantine of the Ikeis and others. *In re Jones, et al.*, SP0141-20 (Pet. Order Auth. Cont. Quarantine or Isolation (Sep. 23, 2020)). On September 25, 2020, the Court appointed the Public Defender Service Corporation to represent all persons under government quarantine, which included the Ikeis. *See Igros v. DPHSS*, SP0127-20 (Gen. Order Appointing Pub. Def. Servs. Corp. Represent Persons in Quarantine and Entering Quarantine (Sep. 25, 2020)).

As there was an ongoing evidentiary hearing concerning DPHSS' quarantine of incoming passengers, the Court included the present cases as part of the consolidated hearing. The Court therefore incorporates testimony and evidence heard before the Court on September 17-19, 22-26, and 28-30, and October 1-3, 2020.

## II.     FACTUAL FINDINGS

The Court makes the following findings by a preponderance of the evidence. The Court bases its findings on the testimonies of Chima Mbakwen, Containment and Infection Control Branch Lead for DPHSS; Arthur San Agustin, Director of DPHSS; Dr. Felix Cabrera, admitted by the Court as an expert in infectious disease and a member of the Governor's Physician's Advisory Group ("PAG"); COL. Dr. Michael Cruz, leader of the PAG and the governor's chief medical advisor; DPHSS' epidemiology fellow Stephanie Kern-Allely; and Chad Ikei.

### A.  COVID-19:  Viability and Contagiousness

Between mid-March and late July 2020, Guam had recorded approximately 348 cases of COVID-19. Within the two months thereafter and by late September when these lawsuits were heard, the number surged sevenfold to 2,488 cases. *See* Ex. 4 (chart reflecting rise in local cases); *see also* Ex TT (Situation Rep. 157). In response to the exponential rise of cases, Governor Lourdes Leon Guerrero placed Guam in Pandemic Condition of Readiness 1 ("PCOR1") on August 14, 2002. *See* Executive Order No. ("EO") 2020-27. The Centers for Disease Control (CDC) has also placed Guam on Risk Level 3.[1] Positive cases continue to accumulate at a high rate; as of the date of these Findings of Fact and Conclusions of Law, Guam has now had over 4,000 positive COVID-19 cases.[2]

COVID-19 is a novel virus. As evident by evolving CDC and public health policies, doctors and scientists continue to adjust their recommendations of safe practices as they learn

---

[1] *COVID-19 in Guam*, CENTERS FOR DISEASE CONTROL AND PREVENTION: TRAVELERS' HEALTH (Aug. 6, 2020), https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-guam#:~:text=COVID%2D19%20in%20Guam%20%2D%20Warning,Notices%20%7C%20Travelers'%20Health%20%7C%20CDC.

[2] Joint Information Center Release No. 411 (Oct. 23, 2020) available at http://dphss.guam.gov/covid-19-jic-releases-executive-orders/.

more about the virus. However, one recommendation that has remained constant since the beginning of the pandemic is a fourteen-day quarantine, which spans the period in which one may be infectious.

Infectiousness and symptoms vary over the fourteen days. For instance, when a person is infected with COVID-19, they are not likely infectious on the first and second days. *See* Ex. XX (chart tracking infectiousness over a period of fourteen days). On day three, infectiousness begins to rise then reaches its greatest potential of transmission between days four and nine. Similarly, a person may not show symptoms on those initial days after an infection. Symptoms may start to show by day five, although many people remain completely asymptomatic throughout the fourteen days.[3] In fact, of all positive cases, 50% receive the virus from persons who do not display symptoms.

A person's infectiousness also varies depending on whether he or she is symptomatic or asymptomatic. If an individual is infected and asymptomatic, by day ten they have little to no infectiousness. *See* Ex. XX. But a symptomatic individual may remain more infectious through days thirteen and fourteen. *See Id.*

The same variations that affect infectiousness also impact testing. For instance, the optimal time to test for COVID-19 is between days five and seven, which aligns with when one is most infectious. *See* Ex. XX. Before day five, however, testing is less accurate and consistent. The reason is that the virus takes time to develop within the body. Testing prior to day five risks what DPHSS referred to as a "false negative"--in other words, when someone is infected but obtains a negative test result.

---

[3] DPHSS does not track how many of the thousands of persons who tested positive on Guam since March 2020 were asymptomatic.

The manner of testing is also affected by the novelty of COVID-19. When testing persons in government quarantine facilities, DPHSS primarily uses a RT-PCR/molecular test ("PCR test"). This is the "nose-swab test" and it works by detecting the presence of the virus in one's nose. When used on persons not previously infected with COVID-19, a PCR test yields a 99% accuracy rate. However, this method of testing has its limits. PCR tests are not recommended on persons who have recovered from COVID-19 within three months, as it may detect dead virus particles and reflect a positive test result even though the person may be fully recovered from COVID-19. *See* Exs. JJ (CDC guidance stating that retesting someone in the three months following initial infection is not necessary unless that person is exhibiting the symptoms of COVID-19 and the symptoms cannot be associated with another illness) and KK. This is referred to as a "false positive." *See* Ex. JJ. A serology test better reflects the condition of these individuals. Rather than a swab in the nose, a serology test measures for virus antibodies in the blood. Depending on the level of antibodies measured, the test determines whether the individual previously had COVID-19.

Most important, as is widely known, persons infected with COVID-19 are highly contagious. Absent precautionary measures such as social distancing, mask-wearing, or the regular washing of hands, the rate of COVID-19's spread is 1:2.5, that is, one person can infect up to 2.5 persons. Those 2.5 persons then may each infect another 2.5 persons, and so on. Under this model, after a period of one week, the impact of one positive and infectious person would result in 250 infections. However, when the standard precautionary measures are taken, the contagiousness rate decreases to about 1:1.7. The Court also notes that individuals who have recovered from COVID-19 within three months are much less likely to be reinfected.

The rate of infection in a community has a correlative effect on the community's mortality rate; though the evidence regarding Guam's mortality rate presents issues. At the hearing, DPHSS represented that Guam's mortality rate is approximately 2%--lower than the World Health Organization's estimated 3.4% mortality rate. The rate, however, is partially based on those individuals in the community that test positive for COVID-19; and notably, not every person that is infected with COVID-19 has been tested.[4] Nonetheless, at the ratio discussed above of 1:2.5, one person's infection could lead to the deaths of five to eight people. Even at a rate of 1:1.7, within ten days, one person's spread may infect close to 200 persons. At a mortality rate of between 2% to 3.4%, one person's infection could result in two to seven deaths. Beyond the potential fatal outcome of a COVID-19 infection, many will suffer long term effects of COVID-19 including neurological complications, foggy memory/concentration issues, and cardiac involvement.

### B. Government of Guam & DPHSS Quarantine of Incoming Passengers

Since March 2020, DPHSS has implemented a quarantine of incoming travelers to protect Guam against the importation and spread of COVID-19. *See In re Travelers arriving in Guam from Manila, Philippines on or about March 19, 2020* ("In re Travellers arriving from Philippines"), SP0049-20 (Apr. 1, 2020). Quarantine procedures have fluctuated since then, with a more lenient policy implemented during the summer months when Guam's COVID-19 numbers flattened. From June to mid-August 2020, DPHSS permitted various exceptions to the fourteen-day quarantine, including bypassing government facility quarantine for home quarantine depending on whether the passenger presented a recent negative test and the number

---

[4] Accordingly, Dr. Cabrera, who testified that he had COVID-19 but tested negative, is not accounted for in the calculation of the percentage. *See* Test. Dr. Felix Cabrera.

of COVID-19 cases reported from their place of origin. DPHSS Guidance Memo 2020-11 Rev6 ("Rev6").[5] On or about August 21, 2020, however, Governor Leon Guerrero issued a series of Executive Orders reinstituting a fourteen-day government-facility quarantine of incoming passengers to Guam. EO 2020-28; EO 2020-29. DPHSS followed the orders with Guidance Memo 2020-11 Rev7 ("Rev7"), which detailed the administration of the quarantine. *See* Ex. C.

With limited exceptions, Rev7 forced all incoming passengers to enter a mandatory fourteen-day quarantine at a government facility regardless of where a person arrived from or if they received a negative test before arriving. While not explicitly stated in Rev7, on approximately day twelve, DPHSS would issue a PCR test and upon the receipt of a negative test and the completion of the fourteenth day, the individual would be released from the government facility. *See* Test. Chima Mbakwem.

This policy remained in place until September 25 when DPHSS issued Guidance Memo 2020-11 Rev10 ("Rev10") following EO 2020-33.[6] Rev10 carved out a broad exception to spending the entire fourteen-day in government facility quarantine.[7] Under the new policy, individuals in a government quarantine facility may receive a COVID-19 test upon their consent on the sixth day. For those who choose to test, if the individual receives a negative result, they may transfer to home quarantine for the remainder of their fourteen-day quarantine. Persons who test positive, on the other hand, are subject to isolation protocols established by DPHSS,

---

[5] DPHSS Guidance Memo, 2020-11 Rev6, available at https://dphss.guam.gov/wp-content/uploads/2020/08/1-DPHSS-GUIDANCE-MEMO-2020-11-REV6-COVID-19-08.05.2020-003.pdf. Rev6 was in place during this Court's consideration of *Shawl v. DPHSS*, SP0123-20 (Order after Hearing (Aug. 28, 2020)).

[6] In EO 2020-33, Governor Leon Guerrero maintained the quarantine but appeared to have lifted language from the prior Executive Orders that specified quarantine was to occur under certain statutory provisions.

[7] Rev10 was not introduced as an exhibit at trial, but it was referenced during the testimonies of Dr. Cabrera and Dr. Cruz.

including home isolation if the home is deemed suitable by DPHSS.

When an individual tests positive for COVID-19 while in government facility quarantine, DPHSS separates the person from any others they may have been quarantined with. Once separated, DPHSS "resets the quarantine clock" of those who tested negative. In other words, they must quarantine for an additional fourteen days, with the potential to remain in a government facility for at least the first six additional days.

While not explicitly stated in Rev10, persons who refuse to take a COVID-19 test stay under quarantine in a government facility for the entire fourteen days. Interestingly, because asymptomatic individuals are unlikely to be infectious by day ten, persons who test positive but show no symptoms may be released from isolation on the tenth day. *See* Ex. TT at 4. This policy, however, is not extended to asymptomatic individuals who remain in government facility quarantine until day ten because they refuse to take a test.

## C. The Ikei Family

On September 16, 2020, six members of the Ikei family traveled from Arizona to Guam to attend the funeral of a close family member who had passed away from COVID-19. The family consisted of the father (Chad), three adult children (Chance, Rosalani, Tiare-Lynn), and two minor children. Racquel Dizon-Ikei, the spouse of Chad and mother of the five children, arrived in Guam prior to their arrival and spent fourteen days under government-facility quarantine. Racquel had attempted to be transferred out of or released from government quarantine early under a hardship exemption but was unsuccessful. Based on his wife's experience in a government quarantine, Chad understood before his arrival that Guam's public

health authorities were placing incoming travelers into quarantine at a government facility.[8]

According to Chad, all members of the Ikei family contracted COVID-19 in mid- to late-June 2019 and all suffered various symptoms including fever and body aches. At trial, Chad provided copies of test results for himself and Chance demonstrating positive COVID-19 tests in late June 2019. *See* Ex. OO. Chad testified that a doctor in Arizona advised him not to have the remaining Ikeis tested, as it was not necessary to confirm their contraction of COVID-19.

When the Ikeis arrived at the A.B. Won Pat International Airport, they were approached by two women asking them to fill out a Voluntary Quarantine Letter and a Voluntary Quarantine Order. They informed Chad to leave the address information blank as they would fill that part out. Chad felt threatened to sign the voluntary quarantine paperwork. The Ikeis were not provided with a directive to quarantine. Chad obtained paperwork for his application for a hardship exemption from quarantine and was informed that the application would be rushed. No one advised Chad that he could object to being placed in government quarantine or that he had the right to counsel.

On September 18, 2020, while still under government quarantine, the Ikei family lost another close relative to COVID-19.

On September 20, 2020, on their fourth day of quarantine, the Ikeis agreed to be tested for COVID-19. It appears the test issued was in response to the Ikeis' pending hardship exemption application, because, during this time, DPHSS only offered tests on a traveler's

---

[8] Chad did not attempt to secure negative COVID-19 tests for himself and his children in the days prior to his arrival in Guam. His wife had secured two negative test results before her arrival but was still required to quarantine for fourteen days. Chad therefore believed that securing negative test results would not have impacted an earlier release from government quarantine; moreover, he had only a few days to prepare for the trip and did not have sufficient time to procure tests.

twelfth day in quarantine. DPHSS used a PCR test and the test results for Rosalani came back positive; all other family members received negative test results.

As previously mentioned, on September 22, 2020, the Ikeis filed an Order to Show Cause for a Hearing on their Verified Petition for Habeas Corpus, Alternative Writ of Mandamus, and Injunctive Relief. *See supra* at page 2. The Ikeis also moved the Court to enjoin transferring Rosalani to an isolation facility, citing the recent family deaths and Rosalani's mental health. They asked to isolate together at their family home in Maina. On September 22, 2020, the Court denied the request for an injunction but allowed a family member to accompany Rosalani into isolation. *Ikei,* SP0141-20 (Order Denying Request for Inj. (Sep. 22, 2020)). On September 23, 2020, the Ikeis reiterated at the consolidated hearing that because of their close quarters in a government quarantine, it was unlikely that only one member of the family would test positive for COVID-19, and it was more likely that Rosalani's positive test result was a false positive.

On or about September 24, 2020, the Ikei family advised the Court that Rosalani would transfer to isolation with Chad. Because this would leave the two minor children unaccompanied by a parent, DPHSS agreed to transfer the two minor children to home quarantine with their mother, Racquel. The adult children were to remain in government facility quarantine. However, after the hearing, the Ikei family's attorney asked DPHSS to hold off on removing Rosalani, and the Ikei family remained together in a government quarantine facility. On September 25, 2020, the Ikeis renewed their request to be transferred to the family home. The Court asked DPHSS to consider the family's request using its normal procedures for assessing home isolation and quarantine facilities.

On September 26, 2020, the parties advised the Court that a resolution had been reached

and that the Ikeis could quarantine at home separate from Rosalani, who would be in a neighboring unit for isolation purposes. The transfer to home quarantine and home isolation is the first point of separation between Rosalani and the rest of her family. Accordingly, DPHSS restarted the remaining Ikeis' fourteen-day quarantine.

DPHSS re-assessed the family on October 1, 2020. DPHSS' Dr. Meadows cleared Chad and Chance from quarantine because they furnished proof of their prior COVID-19 infections within three months, which indicated that they did not pose a substantial risk of transmitting COVID-19. Dr. Meadows also cleared Rosalani from isolation as she did not show any symptoms for at least ten days. However, three Ikei family members, including two minors, remained under quarantine but in the same residence as their family members who have been released. Because they had not furnished proof of positive COVID-19 infections, DPHSS took the stance that they possibly could have contracted COVID-19 from the positive family member and that they must endure the full fourteen days to determine if they have symptoms as they may be contagious.

None of the Ikeis demonstrated symptoms of COVID-19 since their arrival on Guam. *See* Ex. LL (Ikei children transformed the quarantine hotel room into a workout facility). Also, none of them have experienced the same symptoms they experienced in June when they were afflicted with COVID-19.

## III.   CONCLUSIONS OF LAW

### A. Government's Petition

The Court first turns to the petition filed by DPHSS pursuant to section 19605 asking the Court for an order permitting the continued quarantine of individuals or groups of individuals,

including the Ikeis. Over the course of the consolidated proceedings, the government quarantine procedures have changed; though generally, a fourteen-day quarantine, whether in a government facility or a home, remains in place. As DPHSS now operates under Rev10, the Court analyzes the procedures therein.

Under Guam law, the Court shall grant the petition if, by a preponderance of the evidence, the quarantine is shown to be reasonably necessary to prevent or limit the transmission of a contagious disease to others. *See* 10 GCA § 19605(b)(5). Guam law also employs certain principles that DPHSS must adhere to when isolating or quarantining individuals or groups of individuals. First, "isolation and quarantine must be by the least restrictive means necessary to prevent the spread of a contagious or possibly contagious disease to others." 10 GCA § 19604(b)(1). If a person no longer poses a "substantial risk" of transmitting a contagious or possibly contagious disease to others, then the person is to be immediately released. 10 GCA § 19604(a)(5).

Along with what Guam's statutory standards mandate for quarantines, the Court also must take into account established caselaw governing quarantine and government restrictions as well as caselaw developing in light of the ongoing pandemic. In the COVID-19 era, a majority of courts have applied a 1905 case, *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11 (1905), to evaluate challenges to state restrictions to curb the spread of the virus. *Carmichael v. Ige*, 2020 WL 3630738 at *5 (D. Haw. July 20, 2020) (collecting cases). *Jacobson* considered whether Massachusetts could mandate vaccination against smallpox. According to *Jacobson*, the liberties secured by the Constitution do "not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every

person is necessarily subject for the common good." 197 U.S. at 26. When a pandemic threatens a society, it "has the right to protect itself" and "to enact quarantine laws and health laws of every description." *Id.* at 25, 27. Such laws should stand unless having "no real or substantial relation" to the health crisis or are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31.

In a matter regarding whether California's Executive Orders limiting the operation of churches during the current pandemic violated constitutional rights, Chief Justice John Roberts cited *Jacobson* in support of deferring to public officials. In his concurrence, Roberts stated that courts must afford broad latitude to public officials dealing with medical and scientific uncertainties. *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Mem.) (Roberts, CJ., concurring).

Courts critical of *Jacobson's* applicability to the present-day crisis cite the fact that *Jacobson* predates the U.S. Supreme Court's development of standards for assessing government actions that curb fundamental due process rights. Under a traditional due process analysis involving the infringement of civil liberties, a government restriction must be examined for being "narrowly tailored to further a compelling state interest." *Reno v. Flores*, 507 U.S. 22, 301-02 (1993). While many courts have opted to automatically defer to public health authorities rather than strictly scrutinize such conduct, at least one court has found that the "judiciary cannot abrogate its own critical constitutional role by applying an overly deferential standard." *County of Butler v. Wolf*, 2020 WL 5510690 (W.D. Pa. Sep. 14, 2020). Also, as Justice Samuel Alito has recently explained, "we have a duty to defend the Constitution, and even a public health emergency does not absolve us of that responsibility." *Calvary Chapel Dayton Valley v. Sisolak*,

140 S. Ct. 2603 (2020) (Mem.) (Alito, J., dissenting). *Jacobson* does appear to recognize that courts can make a determination when there is "a plain, palpable invasion of rights" in which case "it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." 197 U.S. at 28.

Furthermore, as the COVID-19 crisis has extended from weeks to months, courts have been skeptical to maintain the deference under *Jacobson*. While courts should entrust public health authorities' decisions when an emergency first arises, "when a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out. While the law may take periodic naps during a pandemic, we will not let it sleep through one." *Capitol Hill Baptist Church v. Bowser,* 2020 WL5995126, *9 (D.D.C. Oct. 9, 2006) (citing *Roberts v. Neace,* 958 F.3d 409, 414-15 (6th Cir. 2020) (per curiam)). Justice Alito also commented on the durational effect of state quarantine measures, explaining that "at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules. . . . [but] [a]s more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights." *Calvary Chapel Dayton Valley,* 140 S. Ct. at 2065 (Alito, J., dissenting); *see also County of Butler,* 2020 WL 5510690 ("It is no longer March. It is now September and the record makes clear that Defendants have no anticipated end-date to their emergency interventions. Courts surely may be willing to give in a fleeting crisis. But here, the duration of the crisis--in which days have turned into weeks and weeks into months--already exceeds natural disasters or other episodic emergencies and its length remains uncertain.").

While this Court continues to give the benefit of the doubt to DPHSS when it administers

measures to fight a pandemic, it cannot help but find that there is no end to the present public

health emergency. What may have initially been a quick, temporary measure to stop a pandemic

from reaching Guam's shores has now become perhaps the longest and most restrictive

quarantine of any U.S. jurisdiction.[9] When examining whether DPHSS has lawfully quarantined

individuals for any term, the Court must carefully analyze the "reasonably necessary," "least

restrictive means," and "substantial risk" tests to determine if DPHSS has satisfied the legislative

principles announced in section 19604.

With that in mind, the court first turns to an issue raised by the Ikeis –whether, based on

the evidence presented, government-facility quarantine is reasonably necessary, and if so,

whether the current policy of testing after six days is the least restrictive means.[10]

### 1. Whether DPHSS may mandate the quarantine of arriving passengers at a government facility until a test is administered?

As mentioned above, DPHSS' policy of mandating government facility quarantine for all

---

[9] The unsuccessful challenges to Hawaii's fourteen-day home quarantine policy came from tourists with disturbed vacation plans. *Bannister v. Ige*, 2020 WL 4209225 (D. Haw. July 22, 2020); *Carmichael* 2020 WL 3630738. Unlike Guam, Hawaii did not implement a government-facility quarantine. On the mainland, the mostly unsuccessful challenges to state quarantine efforts concerned citizens' rights to interstate travel. *See, e.g., Bayley's Campground Inc. v. Mills*, 2020 WL 2791797 (D. Me., May 29, 2020); *Page v. Cuomo*, 2020 WL 4589329 (E.D.N.Y, Aug. 11, 2020). The Court has found no recent case examining a state or territory's policy of shuttling residents of a jurisdiction straight from the airport to a hotel for seven- to fourteen-day government-facility quarantine.

[10] DPHSS argued that the issue of government quarantine became moot when the Ikeis transferred to home quarantine. On October 2, 2020, the Court denied DPHSS' Motion to Dismiss from the bench. The Court determined that although the Ikeis had transferred to home quarantine and have now been released from all forms of quarantine, the issue is not moot. Instead, a great public interest remains at stake. In its decision, the Court cited *People v. Blas*, 2016 Guam 19 ¶ 23 in which the Guam Supreme Court declared mootness to be a flexible doctrine, "not a mechanical rule that is invoked automatically whenever the underlying dispute between the particular parties is settled or otherwise resolved." The Guam Supreme Court further explained that "A court has authority to decide cases that are 'functionally justiciable' and present 'important public issues of statewide significance that should be decided immediately. Thus, [the] court may exercise its discretion to 'reach the merits of a technically moot issue' when that issue falls within the public interest exception." *Id.* Based on the reasoning in *Blas*, the Court ruled that whether the government may require quarantine in a government facility is of one of vital significance to the island community, and despite the Ikeis' transfer to home isolation and home quarantine, the Court would determine whether DPHSS had the authority to place the Ikeis in government quarantine.

incoming passengers regardless of prior test results and place of origin, signals a departure from its previous policy. DPHSS argues that the policy change is reasonably necessary because of the correlation between COVID-19 cases imported to Guam by incoming passengers and the increase in cases locally beginning in June. According to DPHSS, the cause of correlation is the unreliability of testing and the ineffectiveness of home-quarantine. DPHSS contends that government-facility quarantine addresses these causes and ensures that the healthcare infrastructure is not overwhelmed.

DPHSS first points to the unreliability of testing. DPHSS contends that it stopped accepting pre-travel tests because of the risk that the test may not accurately advise if a person is infected. DPHSS claims that this test represents a single point in time and an infection occurring while en route to Guam will not be reflected on a pre-travel negative test. Furthermore, as explained above, symptoms often take four days or more to appear and testing is most accurate and consistent on the fifth, sixth, and seventh days after infection.

Next, DPHSS explained that it stopped allowing incoming passengers to quarantine at home because of the rates of unsuccessful home quarantines and non-compliance with DPHSS home quarantine policies. According to DPHSS, unsuccessful home quarantine indicates that the individual could not be located while home quarantining (e.g., due to a false address); whereas non-compliance indicates that an individual did not comply with DPHSS' quarantine procedures (e.g., not answering DPHSS house calls or leaving their house). DPHSS combined these classes of individuals and found that during June, July, and August, roughly 30% of persons on home quarantine were either non-compliant or unsuccessful. *See* Ex. 5. This 30% translates to about 1,500 people who were unmonitored or under-monitored by DPHSS. *See id.*

DPHSS attributes these rates of non-compliance and unsuccessful quarantine as a factor in the rise in cases in August.

Dr. Cabrera also spoke to how the mindset of a person in quarantine differs from a person in isolation. When a person tests positive and is asked to isolate, their positive diagnosis imports greater conscientiousness not to spread the infection. Thus, a person in isolation is more likely to abide by restrictions in order to avoid transmitting the virus. On the other hand, Dr. Cabrera explained that when a person has not been tested and is asymptomatic but unknowingly infected, their personal suspicion of being uninfected will cause them to be more willing to break quarantine protocols. DPHSS argues that this could be one reason many individuals decided not to comply with quarantine.

According to DPHSS, mandating government facility quarantine ensures that no incoming traveler that is asymptomatic and infected with COVID-19 enters the local population. DPHSS claims that this is essential considering the lack of intensive care unit ("ICU") capacity at the Guam Memorial Hospital ("GMH"). Dr. Cabrera testified that the response to the novel virus must be quick and nimble, otherwise GMH's capacity may become overwhelmed.[11]

The Ikeis counter that DPHSS' justification for government facility quarantine--that the increase of positive cases is correlated to incoming passengers spreading COVID-19--is not supported by its data. Specifically, the tracing that DPHSS conducts of positive cases to incoming passengers who test positive within government quarantine is unreliable as it contains potentially duplicative entries. *See* Ex. SS. Also, overall, persons who test positive while in quarantine represent less than 1% of all persons who test positive on Guam. These two figures,

---

[11] The Court notes that while this may be the current state of the island's healthcare infrastructure, capacity concerns may be alleviated due to an incoming tent hospital.

according to the Ikeis, raise questions about whether the recent local spread of COVID-19 can be truly attributed to imported cases of COVID-19.

Looking deeper at DPHSS' data, the Court shares the concern about whether incoming passengers on home quarantine actually resulted in the current local spread of COVID-19. For instance, in the six months between mid-March and September 21, 2020, only ninety-four total cases have been traced to 138 travelers with COVID-19. *See* Ex. SS (DPHSS chart which indicates contract tracing outcomes for persons who had prior travel within fourteen days of a positive test result). Moreover, the ninety-four total cases could also include traced persons who were counted twice if they had contact with more than one positive traveler. *See* Test. Stephanie Kern-Allily.

When put into context of Guam's total COVID-19 cases, the tracing data indicate that incoming travelers represent a statistically insignificant portion of cases. For instance, compared with the total number of COVID-19 cases as of late September--roughly 2,500--the figure of ninety-four total cases traced directly from incoming travelers is less than 1% of total positive cases. Also, examining 138 infected travelers against 25,000 total travelers during the same period indicates that far less than 1% of total travelers have brought COVID-19 onto the island. Finally, Guam has continued to see a high number of positive cases on a daily basis two months after DPHSS implemented a stricter quarantine procedure, which calls into doubt whether travelers continue to cause the rise in cases.

That being said, because it cannot be accurately determined in the first five to six days if a person is infected or symptomatic, the Court determines that the current DPHSS policy which mandates an initial quarantine at a government facility for incoming passengers is reasonably

necessary. That initial quarantine period serves two primary purposes that are rendered more difficult if persons immediately head home from the airport: (1) it allows DPHSS to closely monitor for symptoms; and (2) it offers DPHSS an opportunity to assess for less restrictive alternatives beyond the initial term. Because most persons develop symptoms by day five or six, and because PCR testing does not reach its maximum accuracy rate until those same days, a government-facility quarantine for an initial five- to seven- day period is reasonably necessary to ensure returning residents and visitors have little to no risk of importing the virus.

### 2. Whether the current government facility quarantine is the least restrictive means?

The Court next examines whether there are less restrictive alternatives in lieu of an initial government-facility quarantine, and for persons who refuse to take the day six test, a continued quarantine at the government facility up to the fourteenth day.

Due to the reliability of testing on the sixth day and improvements in managing the COVID-19 spread in Guam, DPHSS changed its prior fourteen-day mandatory government facility quarantine policy to one that tests on the sixth day. Based on the reliability of testing, the Court agrees that the administration of a voluntary test on the sixth day is appropriate as the virus may not be detectable the moment a person arrives on island and a test may not be accurate until at least the fifth day. Also, once a person tests negative on or about the sixth day, they are much less of a risk to transmit the virus and should be immediately transferred to home quarantine. Having already determined that the initial government facility quarantine is reasonably necessary, the Court also finds that it is the least restrictive option as day six represents the floor in determining whether such persons are infectious or symptomatic.

The Court now considers those who refuse to take the day six test. Many travelers before

this Court claim that they decline the test because they question the accuracy of the results and wish not to be forced into isolation based on an inaccurate result.[12] Others assert that they wish to maintain their privacy--which DPHSS respects, as it tests after obtaining consent. Many of these persons, however, wish to quarantine at home. They also repeatedly pose the following question: if incoming passengers represent such a small portion of the spread of COVID-19, why are they treated so much more harshly? DPHSS is not mandating persons on-island to quarantine or isolate in a government facility; to the contrary, DPHSS permits them to quarantine and isolate at home. At least with those required to isolate, it is only when DPHSS concludes that their home is unsuitable for home isolation that transfer to a government facility is utilized.

Incoming travelers do not have the same option. Whether they sign voluntary consents to quarantine or not, incoming travelers all end up in government facilities on the presumption of exposure. Unless such persons apply for a hardship exemption, DPHSS makes no effort to verify whether the travelers' home is suitable for home quarantine. Instead, it presumes that incoming passengers will not adhere to quarantine protocols when they arrive in Guam.

In response to these points, DPHSS argues that there are still risks associated with allowing home quarantine for individuals who choose not to test on day six. DPHSS points to the rates of unsuccessful home quarantine and non-compliant persons in the months of June, July, and August--in which up to 1,500 people who promised to comply with home quarantine protocols were instead in violation. DPHSS also intimates that it does not have the manpower to assess and monitor every incoming passenger's home to determine if it is suitable for home

---

[12] This is particularly true for persons who previously had a COVID-19 infection and recovered, such as Rosalani Ikei. As already noted, a PCR test may detect dead virus particles and result in a false positive test. If such persons do test positive, DPHSS does not take into account the prior infection before forcing the person into isolation. It is only after entry into isolation that DPHSS may elect to have these individuals' medical history reviewed by a medical professional. For Roslani Ikei, that occurred after seventeen days in quarantine/isolation.

quarantine. Finally, DPHSS contends that a full fourteen-day term will allow DPHSS to survey if symptoms develop.

On the issue of compliance, the presumption that all incoming passengers will not comply with DPHSS' home quarantine protocols runs counter to the evidence presented at the hearing. According to DPHSS' statistics, a majority of travelers were indeed compliant. Also, DPHSS does not make the same presumption for positive COVID-19 persons. The Court finds that rather than run on presumptions, DPHSS has less restrictive alternatives when considering persons who refuse to test. In fact, DPHSS already executes a measure to determine whether a person can be compliant--it conducts a home assessment for persons who wish to isolate at home. There is no sound reason placed before the Court why the same home assessment performed on positive COVID-19 patients cannot also be used for incoming travelers who refuse to test. If the traveler meets the same criteria used by DPHSS for home isolation and poses no additional risk for transmitting COVID-19 as a result of his or her travel, then home quarantine with active monitoring by DPHSS does present less restrictive means than government-facility quarantine to prevent the spread of COVID-19 while at the same time not unnecessarily intruding on individual liberties.

Respecting individual liberties while balancing risks of exposure can be achieved through these assessments done at the administrative level. At the judicial level, the Court has heard from countless persons who refuse to test but have shown both the suitability of their home and their commitment to comply with DPHSS' home quarantine protocols. The Court does not doubt that these persons will indeed abide by DPHSS' quarantine regulations even at home, as the majority of incoming travelers did during the months of June, July, and August. But the

"least restrictive means" evaluation is not relegated solely to judicial disputes; it is a factor DPHSS must take into account when it implements any form of quarantine upon individuals or groups of individuals. *See* 10 GCA § 19604. As such, DPHSS must afford these individuals an opportunity to demonstrate their ability to comply with DPHSS policies rather than ignore that step altogether.

On the issue of DPHSS staffing, the Court notes three indications that DPHSS may have enough staff to monitor incoming travelers at home beyond the sixth day.[13] First, performing home assessments is not an arduous process. According to DPHSS, the assessment does not involve a physical visit; rather, it requires a DPHSS representative interviewing the person over the phone. The instant case proves that home assessments do not take extensive effort. After a home assessment was conducted over Zoom, DPHSS allowed Rosalani Ikei to isolate at home and the remaining Ikeis to transfer to home quarantine. Second, also during the course of this litigation, DPHSS instituted Rev10 on its own accord and transferred hundreds of people to home quarantine within a short period. This demonstrates that DPHSS possesses a much higher operational capacity than in March when the Court heard *In re Travellers arriving from Philippines*, SP0049-20 (Apr. 1, 2020). Third, through the filing of section 19605(b) petitions over the past few weeks,[14] the Court sees that a majority of travelers opt to test and transfer to home quarantine after the sixth day. Daily, there is only a handful who refuse to test and remain

---

[13] There seems to be no reason why a home assessment cannot commence within the initial six-day period.

[14] The following non-confidential information was extracted from filings presented under seal as they included the names of persons quarantined by DPHSS: in SP0173-20, 15 out of 162 passengers arriving on September 30, 2020, remained at the government facility on the tenth day; in SP0174-20, 27 out of 203 passengers arriving on October 1, 2020, remained at the tenth day; in SP0176-20, 2 out of 137 passengers arriving on October 2, 2020, remained at the tenth day; in SP0179-20, 14 out of 119 passengers arriving on October 4, 2020, remained at the tenth day; and in SP0181-20 23 out of 181 passengers arriving on October 5, 2020, remained at the tenth day.

in the government quarantine facility until the fourteenth day.

Furthermore, a fourteen-day term of government quarantine for asymptomatic travelers makes little sense when compared with the term imposed on asymptomatic, positive COVID-19 persons--such persons are released from isolation on day ten because they are not likely infectious. Since the worst-case scenario for an individual that is asymptomatic and refuses to test on day six is that they are infected with COVID-19, the Court does not see any reason for the distinction. Again, the evidence presented before the Court demonstrates that asymptomatic persons have a low rate of infectiousness on day ten, and virtually no infectiousness beyond that day. In other words, at day ten, they do not pose a substantial risk of transmitting the virus.

Accordingly, the court finds that requiring asymptomatic individuals who refuse to test to remain in a government facility quarantine beyond day ten is not the least restrictive means necessary to prevent the spread of COVID-19. On day ten, these individuals no longer pose a substantial risk of transmitting COVID-19. They must be permitted to finish their last four days of quarantine at home if they so choose. They must also be afforded a home assessment to determine whether a home quarantine is suitable prior to day ten.

Finally, the Court makes an important distinction here--persons who are symptomatic and refuse to test fall under a different category. As explained above, symptomatic individuals remain infectious until at least day thirteen. When it comes to persons who display symptoms of a COVID-19 infection, there are no less restrictive alternatives to government-facility quarantine. Accordingly, unless DPHSS determines that the untested individual has COVID-19, a person who refuses to test but displays symptoms consistent with a COVID-19 infection should be transferred to isolation or remain in quarantine for the full fourteen days.

To summarize, the Court accepts DPHSS' current policy that transfers to home quarantine persons who test negative on the sixth day. The Court also finds there are less restrictive alternatives for persons who are asymptomatic and refuse to test--they pose no substantial risk of transmitting COVID-19 by day ten and should be transferred home by that day if not sooner if they pass a home assessment. Accordingly, the Court also finds that any policy or government action requiring asymptomatic persons to remain under government facility quarantine after day ten is not reasonably necessary under section 19605.

### B. Ikei Allegations

#### 1. Whether DPHSS violated section 19605 by not providing a directive?

The Ikeis asked the Court for a ruling on whether DPHSS violated their due process rights under section 19605 by not issuing them a directive before commencing their quarantine. The Court has twice ruled in a companion case, *Igros*, that quarantine during this relevant period was mandatory and that DPHSS is required to adhere to the due process protections afforded by section 19605, including issuing directives upon quarantining individuals pursuant to section 19605(a) or petitioning the Court to quarantine incoming travelers under section 19605(b). *See Igros*, SP0127-20 (Findings Of Fact and Concls. Of Law, Sep. 12, 2020); *Id.* (Dec. and Order re Mot. Reconsideration (Oct. 15, 2020)).

The same procedures governing the Igroses remained in place when the Ikeis arrived, and thus, this same analysis applies to the Ikeis. By not issuing the Ikeis a directive, DPHSS failed to comply with Guam law governing mandatory quarantine. DPHSS failed to adequately inform the Ikeis of the nature of their quarantine, their rights to challenge the quarantine, or their right to court-appointed counsel.

**2. Whether DPHSS failed to adequately entertain the Ikeis' request for a hardship exemption; and whether it violated the Ikeis' rights in subjecting them to testing as a condition of the hardship exemption application?**

The Ikeis seek a ruling that DPHSS violated their rights in not entertaining their hardship exemption application. As mentioned above, it appears DPHSS responded to the hardship exemption application by testing the members of the Ikei family on their fourth day of quarantine rather than the twelfth. However, when a member of the family tested positive, the Ikeis were no longer eligible for the exemption. When DPHSS moved to dismiss this issue due to mootness, the Court initially indicated that it agreed with DPHSS. In addition to now confirming that the issue is moot, the Court also rules at this time that in conducting testing of the Ikeis within four days, it adequately entertained their request for a hardship exemption.

During their closing arguments, the Ikeis also asked the Court to rule that DPHSS violated their rights by not advising the Ikeis of their right to object to testing as a condition of their hardship exemption application. The Ikeis further claim that because DPHSS was aware that members of the Ikei family previously had COVID-19, it knowingly administered a test that would generate a false positive.

The Ikeis presented no testimony to support these claims. While Chad Ikei testified that they received tests on their fourth day of the quarantine, he did not testify regarding any compulsion by DPHSS upon the Ikeis. On the contrary, DPHSS maintains that testing is done only with consent. Moreover, there is no evidence that DPHSS attempted to trick the Ikeis by offering a PCR test as opposed to a serology test.

The Court therefore determines that DPHSS did not test the Ikeis without their consent, and their rights in this regard were not violated.

### 3. Whether the Ikeis should be released from home quarantine?[15]

The final issue before the Court is whether the remaining Ikeis should be released from home quarantine even though they did not furnish proof of a positive COVID-19 test from June. Due to the time-sensitive nature of these petitions, the Court ruled from the bench on October 2, 2020, and is now memorializing that ruling in this written decision. As explained above, DPHSS released Chad and Chance from home quarantine because they presented evidence of a positive COVID-19 test from June and displayed no symptoms. The Ikeis that remained under home quarantine displayed no symptoms but did not present a positive test.

The Court credits the testimony of Chad Ikei that back in June, every member of his family contracted COVID-19 and exhibited symptoms. He testified that because the family lives in close quarters in Arizona, because they all demonstrated symptoms, and because two of them tested positive, doctors said tests need not be done on the remaining family members. Chad Ikei offered further witnesses to vouch for his character, and DPHSS attorneys said they did not need further witnesses to confirm his credibility. Based on Mr. Ikei's testimony, the Court finds that all members of the Ikei family had COVID-19 in June.

Because Chad and his son were cleared from quarantine because they had a prior infection from which they recovered, the Court finds that the remaining members of the family still under quarantine ought to benefit from that same release from quarantine. Again, this is a ruling that all family members have now recovered from COVID-19 based on the evidence

---

[15] As part of their closing arguments, the Ikeis contended that DPHSS violated their rights in separating Rosalani from her family. The Court already addressed this issue in its September 23, 2020 Order Denying Request for Injunction. *See Ikei,* SP0141-20 (Order Denying Request for Inj. (Sep. 22, 2020)). In that Order, the Court recognized that Guam law mandated the separation of persons to be isolated due to a confirmed infection from persons to be quarantined. 10 GCA § 19604(b)(2). Due to other issues raised concerning Rosalani's well-being, the Court permitted a family member to accompany her into isolation.

provided to this Court, and based on the scientific evidence presented at trial, they do not pose a substantial risk of transmitting COVID-19 three months after their infection. On that basis, all members of the Ikei family should be released from quarantine as they are not infectious.

## IV. CONCLUSION

At present, Guam is at a critical juncture in containing COVID-19. Despite two months of being under a strict government lockdown, the island continues to see high rates of positive cases. The Court agrees with DPHSS that COVID-19 arrives on Guam's shores through one primary vector: incoming travelers. Because of Guam's remote geographic location, incoming infected travelers may continue to bring COVID-19 into Guam and have the potential to spread it to hundreds of Guamanians within days.

The risks associated with the reliability of testing and of asymptomatic, incoming travelers spreading COVID-19 are mitigated by requiring government facility quarantine for an initial term of six days, which matches when a PCR test is most accurate and when symptoms are most likely to appear. Once a person is tested on or about day six and receives a negative test, they are not substantially at risk of spreading COVID-19 and must be immediately transferred to home quarantine. Asymptomatic persons who refuse to test must be afforded a home assessment and transferred home no later than day ten, which is when the evidence shows they have little to no infectiousness. Finally, DPHSS may continue to quarantine persons who demonstrate symptoms in a government facility for the full fourteen days.

SO ORDERED this 27th day of October 2020.

HON. ELYZE M. IRIARTE
Judge, Superior Court of Guam

SERVICE VIA E-MAIL
I acknowledge that an electronic
copy of the original was e-mailed to:
1)AG's - JJ. Tumaw Kerlaji,
2) POSC
Date: 10/27/20 Time: 5:11
Deputy Clerk, Superior Court of Guam

Appearing Attorneys:
Jacqueline Taitano Terlaje, Esq., Law Office of Jacqueline Taitano Terlaje, P.C., and Assistant
     Public Defender John Morrison, Public Defender Services Corporation, for Chad Ikei,
     Chance Ikei, Rosalani Ikei, Tiare-Lynn Ikei, and two Ikei minors
Deputy Attorney General James L. Canto, II, Esq., Office of the Attorney General, for DPHSS